May it please the Court, my name is Dan Lausing. I'm here on behalf of the City of Bainbridge Island. I would like to reserve a couple of minutes for rebuttal, if I may. All right. The two issues that are presented on this appeal are both pursuant to the Telecommunications Act, which is Title 47 U.S.C. 332 C.7. Those two issues are, first, does the City's decision to deny T-Mobile the permit application prohibit or have the effect of prohibiting the provision of personal wireless services? The second issue is, is the City's decision to deny supported by substantial evidence? And the City takes the position that the trial court, that is the judge who decided this on summary judgment, the decision was wrong because the, and it must be overturned, the standard for review of the district court's decision on summary judgment, of course, is de novo. And we start with the premise that we need to look at the Telecommunications Act itself. Start with this proposition, that if you look at three But if you look at the, it seems Sprint 2 has happened. Sprint 2 has happened. Has happened since the district court. It has. In this matter. And so you lost down below. And if we look at Sprint 2, it, Sprint 2 seems to, maybe your best argument would be that the district court conflated some of the analysis. But let's assume that maybe if you look at the zoning statute and assume that it was, that that was supported by substantial evidence. But then you have to move to whether the Wireless Act, you know, you have to move to that. And it seems that T-Mobile put on significant evidence about alternative sites and the city didn't do much. So. Well, if I may. Don't you have some sort of burden or we don't know after Sprint 2 exactly. I think the significance of Sprint 2 largely pertains to Section 253 of the statute, which when this case first went before Judge Jones and he granted Sprint's or T-Mobile's motion for summary judgment, it was on the basis of Section 253, the decision being that 253 preempted the zoning requirements that the city of Anacortes had set forth and that therefore the decision by the city was defective because its zoning laws were effectively preempted by Section 253. All right. We know that's wrong. But this would be the first case that's interpreting post-Sprint 2. Right. But I think what's significant is that also, not only would it be the first case sort of interpreting post-Sprint 2, this case involves Section 332, which is not Section 253. Section 332, and it's very, very important to start with this proposition because it's in the Telecommunications Act. Congress had the opportunity to make a different choice in terms of its language. And, in fact, there's some language in some of the reported cases that talk about the conference committee discussions about this. Congress made a very important decision and it's set forth in 332C7A. We start with this proposition. General authority, except as provided in this paragraph, nothing in this act shall limit or affect the authority of a state or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless services facilities. So we start with the proposition that Congress has said, we leave those decisions to the local authorities. Now, there are exceptions to that. Those exceptions are the ones that we're talking about today, the two that we're talking about today. One of them is that the regulation of the placement, construction, and modification of personal wireless facilities shall not prohibit or have the effect of prohibiting the provision of personal wireless services. So in enacting its zoning and enforcing and making decisions on permit applications, the city, in this case the city of Anacortes, is not allowed to make a decision which would have the effect of prohibiting provision of personal wireless services. Because no one wants these towers in their backyard. Well, that is true. And so, you know, it would be really easy for if you just read that, if you say like that, then all that they would have to say is it's not aesthetic and I haven't seen an aesthetic one yet, and then city councils could just say, okay, you can't do it. But they have to go. So if I give you that you've got substantial evidence supporting how they can zone this, go to the next level and tell me how it doesn't violate, you know, how it doesn't violate that they can't disallow any coverage. We also start, getting past the statute language itself, we also have to look at the deference which is accorded to the public jurisdiction's decision. The standard of review is substantial evidence. The city, in this case, has to be accorded deference in its decision. And if there is substantial evidence supporting its decision, then the decision must stand. In addition to that, it is the burden of the applicant, in this case T-Mobile, to show that there wasn't substantial evidence. How do we define substantial evidence? Substantial evidence has been defined many times as to what it really amounts to. So what we're saying is that the district court erred when it decided on summary judgment that the city had not provided substantial, had not ruled, had made this decision on the basis of substantial evidence. That gets back again to the notion that we have to start with the notion that the applicant, in this case T-Mobile, has to show that the city did not have substantial evidence. And so the substantial evidence is more than a mere scintilla, less than a preponderance. It's not, frankly, a very high standard. Then the question is substantial evidence of what? And the argument then is over least intrusive. Right. There is an argument, Your Honor, about what is least intrusive. And I think that T-Mobile and the city have a basic disagreement over that notion of least intrusive and what it means in terms of the obligation. But let's assume that T-Mobile, we put the burden on T-Mobile to show the least intrusive. They put on a fair amount of evidence at this summary judgment. What did the city put on? Well, the city had took evidence. It didn't necessarily put on some of its own evidence, to be sure, but it took comments from the public as well. The city did one thing that it said, like, okay, well, now you can go back and you can talk to the school if you pay them more money. But that, you know, that doesn't seem like they had already, things had already fallen short. So that doesn't seem to answer the question. But if you look at the Metro PCS case, the Metro PCS versus San Francisco case, that is the district court case out of California in 2006, the key time for determining whether or not least intrusive has been met is the time when the city, in this case, issues its final decision, which was in September of 2007. By September of 2007, it's clear from the e-mails and the excerpts of record that the school district was willing to open a dialogue, again, with T-Mobile to discuss placing a monopole at the school district property. And with respect to that. That means it's available. I mean, the city at one time said they wouldn't. I mean, the school district said it wouldn't. And they say, well, now we're willing to talk. I don't know. It did, Your Honor. But by the same token, it's not at all clear that even with respect to the preferred site, that is the second preferred site, the very first preferred site by the T-Mobile folks, and the record is the school district site that we're now talking about. But if we go to the second site, the site on H Street, it's not at all clear that that's been nailed down by anybody. In other words, no one has necessarily, in the record, I don't believe, indicates that there's a guaranteed option for that spot. It is not the obligation of the city to assure that the applicant has a place, that has the right to place it in terms of private lease arrangements or otherwise. It is simply that the applicant has to show that it is proposing the least intrusive method of dealing with a significant coverage gap. And in this case, not only did the city indicate that there were other options available, the city did offer up its own water tower. The city did offer up its own property. Well, what evidence is there in the record that the water tower alone doesn't work, right? The water tower alone may or may not work, but there is also testimony and evidence in the record that a multi-site facility would serve the same purpose, would in fact cover the same significant coverage gap that T-Mobile apparently is suffering from now. And it is not the obligation of the city to provide a facility or a spot for a facility which is only one. It is the obligation of the applicant to provide the least intrusive method. If that is two towers that are 40 feet tall as opposed to one tower that's 116 feet tall, so be it. The city has decided and decided in making its decision that the applicant did not meet the least intrusive methods test. Wasn't there evidence that the alternative sites would still require the same height? It depended on the location, Your Honor. This location is hilly, and depending on where you put these facilities, the tower may be as tall or shorter depending on where you put them. But, again, it is not our obligation, and it is not the city's obligation, to hire experts to provide information as to what is the least intrusive method. That's the applicant. You don't really have a case to say that. I mean, you're saying that right now. But after, I mean, Sprint 2 was primarily a facial challenge, and now we're dealing with, you know, that. So now we're dealing with a denial of a specific application. True. And, you know, which is on aesthetic concerns. So I think there are questions out there as to how courts are to determine whether the denial of initial application constitutes an effective prohibition of service. We don't have any cases out there that says whose burden that is. We have cases that show that the burden is on the applicant to provide the least intrusive facility. That's their burden under Metro PCS, both of them, the district court case and the court of appeals case. And with respect to, I think one of the things that maybe is at issue. But it still has to be something that works, too. Yes, it does, but it is the. It doesn't have to be the perfect solution. It doesn't have to be the best solution, but. For the applicants, you mean. Exactly. But cities can't just say we don't want any in this whole place. No, they can't, and they don't. I mean, in fact, the city of Anacortes already has towers, both T-Mobile towers and those from others. They haven't denied T-Mobile the opportunity to put facilities in that would clear up a so-called significant coverage gap. But what it is, it is, and I think one of the things that's lurking behind the scenes here is this notion that the NIMBY thing, that I don't want these towers anywhere. None of them are pretty. None of them look good. And it's clear that a generalized notion of I don't want a cell phone tower anywhere near me is disfavored by the courts, clearly. But if there are specific concerns about a tower at a specific location, those concerns are accepted and adopted by courts all the time. And so if we say I don't like towers, I don't like cell phone towers at all, that is a problem, would be a problem if it were the only basis for the city's decision that it violated the codes and that it violated the comprehensive plan and so on. But there are, in fact, and were, in the record, numerous citizen complaints about this particular tower at this particular location. It's the height of a 10-story building in a residential area. The trees that are now partially shielding it are overmature trees. They will not survive very long. And this thing will be naked 116 feet tall before very long. I realize I'm coming up out of time. Thank you, Your Honor. Thank you. Good morning. Good morning. May it please the Court, my name is Scott Thompson on behalf of T-Mobile. I wanted to respond to a couple of points. The first one is on the issue of the Sprint decision. I actually agree with counsel for the city. The Sprint decision doesn't have any real impact on this case as it stands now. We've dismissed the 253 count. And in Sprint, the Ninth Circle En banc panel said that the standard that they were going to apply in 253 cases was going to be the same as the Metro PCS 332 standard. So Sprint really didn't change the standard for 332 claims, which is what is before the Court now. The second issue I wanted to deal with is the city has two problems with its arguments. The first is that it's citing the wrong standard, legal standard. And the second is it's relying on inconsistent or inappropriate interpretations of the facts. Dealing with the standard first, the city is confusing the deference that's given to a city under the substantial evidence test with the analysis that has to be made in the question of whether or not the city's decision has the effect prohibiting the ability to provide service. There are cases that say that on the second point, on the prohibition issue, the cities are not entitled to deference. The purpose of 332C7's prohibition provision, as the Supreme Court in the Abrams case recognized, was to limit the traditional zoning of cities. If cities, as the city of Anticor suggests, were in a position to simply say, no, we don't think that this particular site is the most acceptable, well, then nobody could ever prove a prohibition on appeal. And the Ninth Circuit in Metro PCS recognized that, right? In Metro PCS, the Ninth Circuit rejected the least, not least, the only feasible technical option that had been adopted by the First and Seventh Circuit. It also rejected what in the district court in that case had attempted to do was formulate a standard that said, well, if it's the most acceptable option. What the city is arguing here is really a variation on that. They're saying, yes, T-Mobile has submitted all this evidence of its consideration of many alternatives, which is clear, but we don't think that this one is the least intrusive. But if the city were given the sole choice to make that decision, how could an appeals court ever overturn it if it were to force deference? It's not really explored about the water tower that much. They do mention that the school district is now willing to talk. I can respond to those, Your Honor. That's actually, I think that that's not true. Let me address a couple things. First, T-Mobile clearly did address the two-site alternatives. At the March 28, 2007 hearing, Mr. Abrams, T-Mobile's technical representative, testified, and this actually appears on two different pages. One is, the first is S.E.R. 160 and the second page is E.R. 389. He testified about the combination of the Queens Island tower with the city's water tower. And he testified that, and I'm going to quote here, if you look at the two coverage maps, it would leave an enormous significant coverage gap within the center of the city. And as we've discussed in prior planning commission hearings, most of this is residential, and we would still need another tower to fill that in. So he's addressed, looking at their coverage maps, looking at the arc propagation, that those two sites would not work. The other two-site alternative that the city relies on heavily now is a combination of the school with the Queens Island tower. Now, I think that the district court correctly found that, and as a judge can be recognized, there's no evidence on the record that the school was ever going to even talk to us. The email, the second email from the school district talked about, if there's a public good that might be served, the board would listen. But the writer, the representative of the school board said, I would be surprised if they acted in any manner other than with a great deal of caution, and reiterated that where they stood was that because of security issues, neighbor concerns, community concerns, they were not going to agree. A critical issue that I want to point out is the city is now arguing that somehow this was a cost issue. There's record evidence, Mr. Blake Thompson, who's a resident who opposed this, had written a letter to the city that appears at ER 152, in which he said that he had talked to the school district to ask them why they would not allow the lease, and they had told them it had nothing to do with money. It had to do with their other concerns about student safety and community reaction. Likewise, at record site SER 140, Mr. Abrams from T-Mobile testified that when the school district had said no, money had not even yet been discussed. So the idea that somehow the school simply wanted more money, there's no support for that, and there's no evidence that the school would have ever said yes. In fact, there's evidence in some of the hearings of people objecting to the idea of it being put in a residential area or a school. So I think the reality is the school was not an option. Yes? It was the burden of your client, I think, to show that this tower was the least intrusive means of accomplishing the communication purpose to which you're entitled to accomplish, and this was the least intrusive way of doing it. Now, you've explained how the water tower in combination with something else wouldn't really do it because there would still be a gap. You'd have to build another tower. In what other way, and you mentioned the high school didn't work out, and now whether it would be possible or not is apparently up in the air. I don't know. But why else is the location that you want here, why is that the least intrusive? Your Honor, the record shows that T-Mobile looked at close to 20 different alternative sites. Yes, okay. And as to each one of them, in fact, most of those, even the city's own expert recognized, they're basically not going to work, period, from either a technical standpoint or otherwise. The city's expert identified four what he called possibilities. Two of them were schools. So that's out the window on the grounds that the school isn't going to agree. Moreover, one of those schools was likewise in a residential district. The other two alternatives, one of which was the police headquarters. The other was the National Guard, both of which are basically the same location. They're both at 24th and M Street. The police captain had said, no, you're not going to get to do that here. In addition, T-Mobile's representatives, in their RF propagation studies, had shown that even with those locations, there would still be significant gaps left. And moreover, the point there was both of those require still a tall tower, and there's no screening trees there whatsoever. And, in fact, there's apparently hospital helicopters that come in. So it raised a host of problems at this 24th and M location, which was the National Guard and the police headquarters. What we've really got going on here is the city, in its decision, recognizes that T-Mobile has made these analyses, but the city council essentially tries to impose its own technical analysis over the technical analysis that was done by T-Mobile, and courts have rejected this kind of attempt to do that. For example, the Tenth Circuit in the Wyandotte County case, the city of Carlsbad case. The city can't, in the face of technical evidence from the carrier showing that these will not close its significant gap, nonetheless declare, well, we think that they might. And that's essentially what we've got going on here. That's one of the reasons why the district court correctly held that the city had no substantial evidence for its decision that these other alternatives would ever work. Even if they were available, even if these places were available to T-Mobile, they would not work to close the significant gap. He's saying that we have a right to put this tower up, even though it's going to be intrusive. There'd be, what, they had 200 neighbors there that had written letters of opposition or something like that. We know it's going to be intrusive, but we've got the right to put up this intrusive tower, so long as there are no other places in this area which would be any more intrusive or that this is the least intrusive of what we could do. We therefore have a right to put it up, even though it intrudes. Ultimately, that is correct. And I don't want to conceive that it's as intrusive as the city makes it out. You've got neighbors that don't like it. You've got a big tower. It's got to be higher than the trees, and the trees are old and they're dying. I don't know that there's evidence about how soon those trees are going to die, but if you look at the photo simulations that T-Mobile did, the balloon tests, it's not going to stick up that high over these trees. This is a very screened location. The mere fact that people can see it cannot be grounds to say that it's going to be a detriment to the community because they all would be. They're all going to be visible. It has to stick up above the trees to work. If you don't win at summary judgment on this, if there were, you know, is that a court trial after this? In this case, I don't believe it is. We rested the – if, well, I suppose. But just generally speaking, if these cases don't resolve on summary judgment, are they a court trial as opposed to a jury trial? Only on the issue of whether there's a prohibition. The substantial evidence question is strictly about the record before the city, the city's decision on the record as it appeared. Courts have allowed plaintiffs to introduce new evidence on the question of whether there is a prohibition. Now, in this case, I don't think that that's necessary. We've stipulated to the contents of the record, and here you've got an overwhelming amount of record evidence by T-Mobile. But it's not a jury trial. No. I don't think you'd ever get the power if it were a jury trial. We wouldn't request a jury trial. Let's see. If there are no other questions, I would just wrap up by saying that – well, I wanted to answer one part of Judge Thompson's last point. I want to make clear that the standard that Metro PCS rejected, but that the city is trying to push here, is the idea that T-Mobile has to show that there's no feasible technical alternative available. In Metro PCS, the Ninth Circuit said that that is too stringent. There's a difference between no other possibility and the least intrusive alternative, the least intrusive means. The least intrusive means requires T-Mobile to demonstrate a meaningful evaluation of the alternatives, and it has done that in this case, as the district court correctly found it. So we can see that that's your burden initially? Yes. All right. So that being said, is it a little bit like employment cases or whatever? Once you've met your burden, then they've got to put something on to essentially show that you're wrong? I think that that's right, Your Honor. The initial burden under the Metro PCS decision certainly puts a burden on the carrier to demonstrate that it has engaged in this meaningful analysis, good faith evaluation of the other alternatives and shown that, for whatever reason, they are the one that's chosen is the least intrusive on the values to be protected. That then must put some burden on the city to show, well, then, no, no, this isn't a prohibition for some reason. The Fourth Circuit, with which most other courts don't agree on many things, but it recognized one of the reasons that the Fourth Circuit pointed out was that it puts a burden. This least intrusive means standard puts some burden on the city because, as I point out sort of at the beginning of my argument, if the city were simply allowed to say, well, we don't think this is the most acceptable or we don't think this is the least intrusive, you could never win on a case. Well, you put some evidence on. Okay. You know, I think that's clear. If we were to conclude that the city put nothing on, does that mean you win? I think that even if you conclude that the city did put something on, we could still win. Well, I know, but if they put nothing on, you know, if, say, for example, if it was concluded that just saying that the school was a possibility, you know, that you needed to go back and let's say the court concluded, well, that's not really evidence. I think that that's right, Your Honor. Certainly district court in this case found that that was the case, that the school's conclusion, not the school's, the city's conclusion about the availability of other alternatives had no basis, that it was purely speculative.
judges: Canby, Thompson, Callahan